# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THON NGOT SANG, | 1:05-CV-00628 OWW SMS HC |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| A. K. SCRIBNER, Warden, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on February 11, 2003, of drawing or exhibiting a deadly weapon with the intent to resist or prevent his arrest (Cal. Penal Code § 417.8) and theft of a vehicle (Cal. Vehicle Code § 10851(a)). See Lodged Doc. No. 3.[1] He was sentenced to serve a term of eight years in state prison. Id.

Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District (hereinafter "Fifth DCA"). On May 13, 2004, the Fifth DCA affirmed the judgment. Id. On May 28,

---

[1] "Lodged Doc." refers to the state court records and transcripts lodged by Respondent with the response.

2004, Petitioner filed a petition for review in the California Supreme Court. See Lodged Doc. No. 4. The petition was denied on July 21, 2004. See Lodged Doc. No. 5. Petitioner did not file any collateral actions in the state courts.

On May 12, 2005, Petitioner filed a federal petition for writ of habeas corpus in this Court. The petition contains the following four claims for relief: 1) "Insufficiency of evidence that pocket knife was used against officers as deadly weapon"; 2) "Insufficience [sic] of evidence that pocket knife was a deadly weapon"; 3) Insufficience [sic] of evidence to prove that [Petitioner] would have used pocket knife as weapon"; and 4) "Insufficience [sic] of evidence that [Petitioner] threatened officers in any manner." Respondent filed an answer to the petition on December 1, 2005. Petitioner did not file a traverse.

## FACTUAL BACKGROUND[2]

At approximately 10:30 in the evening, Margie Buys heard a car door slam outside her home. She looked out a window and noticed the dome light in her car was on. She also saw a shadow of someone getting into her father's old dump truck, which was parked next to her car. Ms. Buys thought the person was carrying something. She saw the person leave the dump truck and go into the backyard where her friend, Mike Arburua, kept his work pickup truck. The pickup had a trailer attached that was full of gardening and lawn equipment. Ms. Buys heard the person start the pickup truck and drive it out of the yard. The person did not put the pickup's headlights on until the truck was on the road.

Ms. Buys called her father, John Buys, who lived next door, and told him someone had driven off with Arburua's truck. Mr. Buys called 911, and then went outside and looked at his and his daughter's vehicles. He noticed the glove box on his own pickup was open and a pocketknife was missing.

Later that same evening, dispatch advised sheriff's deputy Christopher Belmore that someone had stolen a pickup truck with a gardening trailer. Deputy Belmore was advised by personnel in a sheriff's helicopter that the vehicle was seen traveling south on Highway 99.

---

[2] The factual summary is derived from the statement of facts set forth by the Fifth DCA in its opinion of May 13, 2004, and is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). See Lodged Doc. No. 3.

Belmore responded to the area where the pickup eventually parked and was told by personnel in the helicopter that the pickup's driver had gone around to the back of a restaurant. Belmore found Petitioner hiding behind some bread racks. After Belmore twice ordered him to come out, Petitioner finally did so with his hands in his pockets. Belmore drew his weapon and told Petitioner to remove his hands from his pockets. Petitioner at first refused and, when he did remove his hands from his pockets, he held a pocketknife. He held the open knife at waist level, pointed towards Belmore. He refused Belmore's repeated orders to drop the knife.

Deputy Gary Engel arrived on the scene to assist Belmore. Engel also drew his gun and pointed it at Petitioner. Belmore sprayed Petitioner in the face with pepper spray to get him to drop the knife, but Petitioner did not. Instead, Petitioner backed himself further into the corner, took off his shirt, and wiped his eyes. Through all of this, Petitioner continued to display the knife.

The officers repeatedly ordered Petitioner to drop the knife, but he refused. Petitioner stated he was a "three-striker" and did not want to go to prison for life. Then he began to slash at his own wrists with the knife.

Additional help arrived on the scene. In an attempt to persuade Petitioner to drop the knife, Deputy Belmore told him that stealing a vehicle was only a misdemeanor. Petitioner responded by telling Belmore to shoot him in the head and just say he had come at him with the knife.

The standoff lasted about an hour and ended only when the officers shot pepper balls at Petitioner. At that point, Deputy Belmore was able to pin Petitioner against a door and take the knife from his hand. Belmore then handcuffed Petitioner and completed the arrest. During the standoff, the officers had feared Petitioner would stab them with the knife.

**DEFENSE**

Petitioner testified that he was driving home when he had an accident and veered off the road into some fields. He ran from the car because he was afraid. He entered a yard, took a pocketknife from the glove compartment of a pickup truck, and "took off" in another truck, because he "had to get home." Petitioner saw white lights around him, which he later realized came from a helicopter. He was afraid, so he pulled off the freeway and stopped. He knew he had taken someone else's truck and that it was wrong, but he planned to give the truck back.

1  Petitioner ran behind a building. When he saw a police officer, he knew he was not "going to
2  make it back home" and wanted to kill himself. He took the knife out of his pocket and began slicing
3  his wrists. Petitioner told the officers he had been to prison and did not want to go back. He cut
4  himself to keep from being arrested. Petitioner denied attempting to hurt or threaten any of the
5  officers. Asked if he had displayed the pocketknife to keep the officers away from him, he answered,
6  "No, I just wanted to go. I just wanted to leave this world."

**DISCUSSION**

**I.  Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d).  Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II.  Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade,  538 U.S. 63, 70

1  (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the
2  adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable
3  application of, clearly established Federal law, as determined by the Supreme Court of the United
4  States" or "resulted in a decision that was based on an unreasonable determination of the facts in
5  light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,
6  538 U.S. at 70-71; see Williams, 529 U.S. at 413.

7  As a threshold matter, this Court must "first decide what constitutes 'clearly established
8  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71,
9  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court
10 must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time
11 of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly
12 established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by
13 the Supreme Court at the time the state court renders its decision." Id.

14 Finally, this Court must consider whether the state court's decision was "contrary to, or
15 involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,
16 *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the
17 writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a
18 question of law or if the state court decides a case differently than [the] Court has on a set of
19 materially indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.
20 "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state
21 court identifies the correct governing legal principle from [the] Court's decisions but unreasonably
22 applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

23 "[A] federal court may not issue the writ simply because the court concludes in its
24 independent judgment that the relevant state court decision applied clearly established federal law
25 erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A
26 federal habeas court making the "unreasonable application" inquiry should ask whether the state
27 court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.
28 Petitioner has the burden of establishing that the decision of the state court is contrary to or

involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v. Estelle</u>, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. <u>Souch v. Schaivo</u>, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petition**

In his four enumerated grounds for relief, Petitioner alleges there was insufficient evidence to support the conviction. He claims the evidence did not show the pocket knife was used against officers as a deadly weapon, that the pocket knife itself was a deadly weapon, that Petitioner would have used the pocketknife as a deadly weapon, or that he threatened the officers.

This claim was first presented on direct appeal to the Fifth DCA. On May 13, 2004, the Fifth DCA denied the claim in a reasoned opinion. <u>See</u> Lodged Doc. No. 3. On May 28, 2004, Petitioner filed a petition for review in the California Supreme Court. <u>See</u> Lodged Doc. No. 4. The petition was summarily denied on July 21, 2004. <u>See</u> Lodged Doc. No. 5. The California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the Fifth DCA. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).

In reviewing sufficiency of evidence claims, California courts expressly follow the <u>Jackson</u> standard enunciated in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). <u>See</u> <u>People v. Johnson</u>, 26 Cal.3d 557, 575-578 (1980); <u>see also</u> <u>People v. Thomas</u>, 2 Cal.4th 489, 513 (1992). Pursuant to the Supreme Court's holding in <u>Jackson</u>, the test in determining whether a factual finding is fairly supported by the record is as follows:

> [W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

1  Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

2  Sufficiency claims are judged by the elements defined by state law. Jackson, 443 U.S. at 324
3  n. 16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C.
4  § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness
5  applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v.
6  Borg, 895 F.2d 520, 525 (9th Cir.1990). Although the presumption of correctness does not apply to
7  state court determinations of legal questions or mixed questions of law and fact, the facts as found by
8  the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455
9  U.S. 539, 597 (1981).

10  *A. Use of Pocketknife Against Officers as a Deadly Weapon*

11  Petitioner first alleges he used the pocketknife on himself, by slicing his own wrists, and not
12  against the officers who were attempting to arrest him.

13  The Fifth DCA rejected this claim as follows:

14  Deputy Belmore's testimony was that [Petitioner] held the open pocketknife at waist level, pointed toward the officers. [Petitioner] refused numerous requests to drop the knife. He did not release the knife when he was sprayed with pepper spray. He told the officers that he did not want to go back to prison. Deputy Belmore testified that, during the hour-long standoff, the officers feared [Petitioner] would stab them with the knife.

17  [Petitioner] testified that he knew he had done something wrong when he took Arburua's truck. He ran behind a building to hide and, when he saw police officers, he knew he was not going to make it home. He told the officers he did not want to go back to jail, and he cut himself on the wrists to keep from being arrested.

20  [Petitioner] argues that, because the evidence shows his purpose in drawing the knife was to kill himself rather than to use it on the officers, the evidence does not show he used the knife with the intent to resist or prevent arrest. At trial, defense counsel, too, argued that the charged crime was not shown because [Petitioner] was using the knife only in an effort to kill himself. However, he acknowledged that another "reasonable interpretation" of the circumstantial evidence as to [Petitioner's] intent was that he was trying to prevent or resist being arrested.

24  We find no language in section 417.8 or case law that suggests a requirement that [Petitioner's] intent to resist includes an intent [to] harm the officers if the circumstances require. We believe such an interpretation would be counterintuitive. The statute does not say it applies only where the accused intended to harm the arresting officer or anyone else. The statutory language proscribes drawing or exhibiting a weapon in order to resist or prevent arrest. It is directed at the use of a weapon, not at the intent to injure. Were we to adopt the interpretation for which [Petitioner] advocates, how would it apply to a situation in which the accused kept arresting officers at bay by using a weapon to threaten an innocent bystander? Either, the statute would not apply or we would be required to read even more into the statute

than [Petitioner] now suggests.[3] Neither alternative, obviously, is appropriate.

> For the stated reasons, we find that substantial evidence exists to support [Petitioner's] conviction under section 417.8.

See Lodged Doc. No. 3 at 7-8.

The state courts determined that California law did not require an intent to injury, only the act of drawing or brandishing a weapon with the intent to resist arrest. Federal courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989). Review of the record reveals substantial evidence supported the finding that Petitioner drew and brandished his pocketknife in an attempt to resist arrest by the officers.

B.  *Evidence that Pocketknife Was a Deadly Weapon*

Petitioner next claims that the pocketknife could not be considered a deadly weapon because it only contained a 2.5 inch blade.

The state court analyzed and rejected this claim as follows:

> Section 417.8 provides in pertinent part, "Every person who draws or exhibits any ...deadly weapon, with the intent to resist or prevent the arrest or detention of himself or another by a peace officer shall be imprisoned." [Petitioner] acknowledges that a pocketknife is capable of causing injury or death, but argues there was no evidence he intended to use the pocketknife as a deadly weapon. Respondent contends section 417.8 does not require such proof independent of evidence that the accused intended to use a deadly instrumentality to resist or prevent arrest. We agree with respondent.
>
> The courts have long recognized a distinction between inherently deadly weapons and deadly instruments that constitute deadly weapons only because of the way in which they are used. Our Supreme Court, in *People v. Graham* (1969) 71 Cal.2d 303, 78 Cal. Rptr. 217, quoted with approval the distinction made between the two classes of weapons set forth in *People v. Raleigh* (1932) 128 Cal.App. 105, 108-109: "'There are, first, those instrumentalities which are weapons in the strict sense of the word, and second, those instrumentalities which are not weapons in the strict sense of the word, but which may be used as such. . . .' [Citation.]" (*People v. Graham, supra*, at pp. 327-328.) While guns, dirks, and blackjacks fall into the first category of weapons, a pocketknife falls within the second. (*Id*. at p. 327.)
>
> "'When it appears . . . that an instrumentality other than one falling within the first class is capable of being used in a "dangerous or deadly" manner, and it may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the circumstances require, . . . its character as a "dangerous or deadly weapon" may be thus established, at least for the purposes of that occasion.' [Citation.]"

---

[3]We would have to say that the statute proscribes drawing a deadly weapon with the intent to injure the officer or another (but not oneself) with the intent to resist or prevent arrest.

(*People v. Graham, supra*, 71 Cal.2d at p. 328.)

In *People v. Pruett* (1997) 57 Cal.App.4th 77, the defendant was convicted of violating section 417.8 when he exhibited and then slashed "back and forth" with a pocketknife as he walked toward a police officer who was attempting to arrest him. (*Pruett*, at pp. 80- 81.) The defendant challenged the court's failure to instruct that the pocketknife was not a deadly weapon as a matter of law and that he could be convicted of a section 417.8 violation only if the jury found the knife was capable of killing or seriously injuring someone and that the defendant intended to use the knife as a weapon in his confrontation with the officer. (*Pruett*, at p. 85.)

The court in *Pruett* agreed that the *Raleigh* definition of "deadly weapon" had two components: "(1) the instrument must be 'capable' of being used in a deadly fashion, and (2) the possessor must 'intend' that it serve such a purpose when the crime is committed." (*People v. Pruett, supra*, 57 Cal.App.4th at p. 85.) Focusing on the second part of this test, the court in Pruett reasoned:

"The question then becomes whether or not the *Raleigh* 'intent' test need be applied for section 417.8 purposes. We hold that it does not. To find otherwise would be tantamount to rephrasing section 417.8 to make it a crime for a defendant to draw or exhibit 'a deadly instrument with the intent to use it as a weapon with the intent to prevent the arrest or detention of himself or another by a peace officer.' The fact of the matter is that a jury's determination that a defendant employed a deadly instrument . . . with the intention of preventing his arrest or detention would necessarily include a finding that the deadly instrument was used as a weapon-or that the defendant intended to use it as a weapon. . . ." (*People v. Pruett, supra*, at p. 86.)

[Petitioner] relies on *People v. Simons* (1996) 42 Cal.App.4th 1100 to distinguish *Pruett*. In Simons, the defendant used a screwdriver to keep officers from approaching him. The court rejected the defendant's claim that section 417.8 could only be violated by use of an inherently dangerous weapon. (*Simons*, at p. 1106.) "The evidence clearly demonstrated that the screwdriver was capable of being used as a deadly weapon and that defendant intended to use it as such if the circumstances required." (*Id*. at p. 1107.) *Simons*, however, was decided prior to *Pruett* and simply does not address the import of that decision.

[Petitioner] similarly relies on this court's decision in *People v. Henderson* (1999) 76 Cal.App.4th 453, in which we addressed whether pit bulls could be characterized as deadly weapons within the meaning of section 417.8. (*Henderson, supra*, at p. 467.) We found the dogs owned by the defendant, "while not inherently deadly weapons, were such on this particular occasion," noting, inter alia, the dogs' agitated state and the fact that they were normally chained to prevent attacks on visitors. (*Id*. at p. 470.)

We also recognized, however, that the second prong of the *Raleigh* test-the intent to use the deadly instrument as a weapon should the circumstances require-need not be applied in section 417.8 cases because it would be redundant to do so. (*People v. Henderson, supra*, 76 Cal.App.4th at p. 468.) Our analysis centered on whether the pit bulls were capable of inflicting great bodily injury or death, not whether the defendant intended to use the dogs as deadly weapons. (*Id*. at p. 470.)

The jury here was instructed with CALJIC No. 9.21.1 (1998 rev.), which defines a "deadly weapon" as "any object, instrument, or weapon which is used in such a manner as to be capable of producing death or great bodily injury." [Petitioner] acknowledges that a pocketknife is capable of causing injury or death. The question then becomes whether [Petitioner] intended to use the pocketknife to resist or prevent arrest.

See Lodged Doc. No. 3 at 4-7.

The state court determined the pocketknife was a deadly weapon within the meaning of section 417.8, because it was capable of producing death or great bodily injury. As noted above, federal courts are bound by state court rulings on questions of state law. Oxborrow, 877 F.2d at 1399. In addition, there was sufficient evidence to support the jury's finding that Petitioner used the weapon in an effort to resist arrest. This claim should be rejected.

### C.  Evidence that Petitioner Intended to Use the Pocketknife as a Weapon

Petitioner next claims he would not have used the pocketknife against the officers. He states he would have thrown the weapon away had the circumstances required. As correctly pointed out by Respondent, the statute does not require that Petitioner used the weapon as a deadly weapon against the officers, or that he intended to harm officers with the weapon. Section 417.8 only requires that Petitioner drew and exhibited the weapon with an intent to resist arrest. As discussed above, the evidence supported these elements.

### D.  Evidence that Petitioner Threatened the Officers

Finally, Petitioner alleges the evidence did not show that he threatened officers with the weapon or waved it in a threatening manner. Again, Petitioner misses the point. The statute does not require that he have threatened the officers. Section 417.8 only required drawing or exhibiting the pocketknife with the intent to resist arrest. Respondent correctly argues that Petitioner could have resisted arrest by making officers think he would cut his own wrists, just as he could by making the officers think he would attack them if they attempted to take him into custody. The state court properly determined there was sufficient evidence to support the jury's finding that Petitioner exhibited the weapon with an intent to resist arrest.

### E.  Conclusion

The evidence in this case was sufficient such that a rational trier of fact could have found Petitioner drew or exhibited a deadly weapon with the intent to resist or prevent his arrest within the meaning of Cal. Penal Code § 417.8. Thus, the state court rejection of this claim was neither contrary to or an unreasonable application of clearly established Federal law, nor an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d). The claim

should be denied.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   May 13, 2008**               /s/ Sandra M. Snyder
                                       UNITED STATES MAGISTRATE JUDGE